1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3   RON MICHAEL WERTH,

4              Petitioner,              No. 2:06-CV-2514-FVS

5        v.                             ORDER DENYING PETITION FOR
                                        WRIT OF HABEAS CORPUS
6   JAMES YATES,

7              Respondent.

8

9        **THIS MATTER** comes before the Court on Petitioner's Petition For

10  Writ of Habeas Corpus.  (Ct. Rec. 2.)  Petitioner is represented by

11  Charles M. Bonneau, Jr.  Respondent is represented by Carlos Antonio

12  Martinez.

13       **BACKGROUND**

14       At the time his petition was filed, Petitioner was in custody of

15  the Pleasant Valley State Prison in Coalinga, California pursuant to

16  his 2002 Sacramento County conviction for murder committed in the

17  course of burglary and attempted robbery, two counts of attempted

18  murder, and various firearm allegations.  *See* Lodged Doc. (Lodg. Doc.)

19  1.  The court sentenced Petitioner "to a term of 18 years, 2 months,

20  consecutive to 25 years to life (two terms), consecutive to life

21  without possibility of parole in state prison."  (Ct. Rec. 2 at 2;)

22  *see also* Lodg. Doc. 1 at 1492-93.  Petitioner challenges his 2002

23  Sacramento County conviction.  (Ct. Rec. 2 at 7.)

24  I.  **Factual History**

25       The California Court of Appeals described the facts of this case

26  as follows:

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 1

Because we view the evidence in favor of the judgment (People v. Staten (2000) 24 Cal.4th 434, 460), we will not provide an exhaustive summary of the testimony of every witness or relate every evidentiary conflict. We also will not detail the potential bias on the part of the witnesses, as this was for the trier of fact. Nor will we distinguish which evidence was admissible as to which defendant since, with the one exception noted above, neither defendant claims that the juries were privy to improper evidence. As the cast of characters for the narrative is extensive, we will impart clarity through labeling them by their roles rather than name; this also preserves the privacy of the inculpable (or less culpable).

I.

A Fair Oaks residence [hereinafter referred to as the "Salmon house"] was the longtime home of the owners and their two teenaged children. The family members were backyard marijuana cultivators. In October 1998, there were about a dozen plants that were between four and 10 feet tall.

While in the back yard of the house on October 5, 1998, the homeowners' son and a friend heard people break down the front door and claim to be members of law enforcement. The friend fled over the fence to a neighboring home, where he called two more mutual friends to come get him. When the two arrived about 15 minutes later, the three of them did not see any indication that law enforcement was present and concluded that it had been a robbery. Searching the home, they found the son incoherent with a bloodied head. Plants were gone. They took their injured friend to the hospital where his mother was a nurse.

The homeowners' daughter[, Jennifer Salmon,] came home from school to find the front door broken open. After neighbors and others explained what had happened, she thought it would be prudent to clean up the house and remove the remaining crop with the assistance of her brother's friends. They took the uprooted plants in two truckloads to another residence. When her father came home, they went to the hospital to see her brother for a couple of hours. They came home and had a late supper of spaghetti with the brother's friends, and shared some marijuana. The mother called about midnight and asked the father to join her at the hospital to help calm their son. The father asked his son's four friends to stay with his daughter to watch over her, then left for the hospital. One of the friends went home at his mother's prescient request. [Jennifer Salmon, t]he daughter-soon to be one of the attempted-murder victims-fell asleep on the sofa while watching a movie with [Riley Haeling,] the murder victim[,] next to her. The other attempted-murder victim[, Shawn Pollard,] had gone to sleep in the son's bedroom. The third friend slept in the daughter's bedroom.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 2

A loud noise awakened the surviving occupants of the home. [Jennifer] saw [Riley] come skidding back into the living room. He had apparently kicked open the door to the son's bedroom to alert the other attempted-murder victim that someone was trying to break into the house. As the latter went groggily to the bedroom door, he saw a familiar figure run toward the living room before he himself ran across the hall into the master bedroom (where he knew there was a shotgun). The third friend awoke in the other bedroom to the sounds of shouts; he immediately rolled out of bed onto the floor.

Almost simultaneously with [Riley's] return to the living room, two men came through the front door. One remained in the living room while the other ran past the murder victim toward the back of the house. [Riley] stood with his hands up; sitting on the sofa, [Jennifer] did the same. The intruder in the living room pointed a gun at them and asked, "Where is it at? Where is it at?" They denied any knowledge. [Jennifer] heard a gunshot from the back of the house. The second intruder came running back screaming, "I got him, dog. I got him. Let's get out of here. Let's go."

In the master bedroom, the attempted-murder victim had grabbed a shotgun and some shells, but found that the shells were the wrong size. Meanwhile, one of the intruders entered the room, pointed a revolver at him, and directed him to get on the floor. Bluffing, the attempted-murder victim cocked the shotgun and pointed it at the intruder. The intruder fired one shot at him; the shot missed, but the victim fell to the floor and feigned being wounded. The intruder left the room, shouting something. The attempted-murder victim ran out a sliding glass door to the back yard. He jumped over the fence to the front but did not see anything. He ran to a neighbor's house, who told him that she had already called 911.

[Jennifer] was in shock when she heard the shot. The murder victim was edging his way toward her. She must have screamed, because the intruder standing watch over them told her to shut her mouth. She heard his gun go off, and threw herself on the sofa. Bullets penetrated the calves of her legs and her torso. As she covered her face, she saw [Riley] moving toward her. A volley of gunfire followed. She heard someone screaming to call 911. Realizing that she was not badly wounded, she called 911 on the phone while she went to see whether someone had been shot in the back of the house.

The third friend, in the relative safety of the daughter's bedroom, had heard "people say like, get that mother fucker, shoot that mother fucker, get them dog ..., stuff like that" interspersed with gunfire. There was silence after the sound of footsteps running toward the front door. He heard someone press three numbers on a phone, which he assumed was a 911 call. He

came out of the bedroom, grabbed the shotgun from the floor of the master bedroom, and walked to the front of the house. He saw the daughter on the ground with her back to the wall, talking on the phone. She was bleeding. She asked him to speak to the operator, and told him that the murder victim was badly injured.

The murder victim died from his wounds. The bullets that were still in his body could not have inflicted the amount of damage associated with a piercing wound. However, there were casings and ejected live cartridges from a more powerful weapon both inside and outside the residence.

The daughter assisted with preparation of a police sketch of the intruder who had been in the living room with her and [Riley Haeling]. Based on the sketch, the authorities prepared two photo arrays. The person she identified in the second array[, David Quindt,] was tried for the crimes. She repeated her identification of him at trial. A jury convicted him in November 1999. [Anthony Salcedo, a co-defendant in the first prosecution, received a mistrial following the introduction of inadmissible evidence. John Anderson, a witness in the Salcedo trial, testified that Salcedo communicated certain things that implied Salcedo was involved in the crimes. However, Anderson did not remember the confession when he testified at Petitioner's trial and claimed that Salcedo never told him he was involved in the crimes. Lodg. Doc. 7, at 1149-52.]

## II.

After the conviction of [David Quindt], Bryan Lutz called the prosecution and told them that the wrong defendants were in custody, and that an entirely different group of people were involved. He was interested in compensation in the form of the dismissal of over a thousand dollars in traffic fines. The prosecution also agreed to dismiss some misdemeanors and to recommend he receive a share of a reward fund that the family of the murder victim had established. The prosecution dismissed all charges against the wrong defendants after further investigations that led to the present codefendants.

Through its investigation, the prosecution collected the statements of a number of people that connected the codefendants with the crimes. We will extract the salient details from each of them.

## A

We begin with the two Iago figures of the piece: Lutz and his lifelong friend (and principal in drug sales) [Kelso Vidal], a cousin of defendant Werth [sic.]. Lutz had learned of the marijuana cultivation at the Fair Oaks residence. Over the course of a week, he pestered Werth's cousin to help find someone who

would appropriate the crop. Lutz eventually was able to recruit two thugs, who committed the first robbery of the home.

After the robbery, the two thugs called defendant Werth's cousin[, Kelso Vidal,] and asked if he was interested in purchasing marijuana. Before they arrived, the cousin called Lutz and determined that the pair were trying to cheat Lutz out of his cut for arranging the transaction; Lutz also suggested that he and the cousin could get it more cheaply from the Fair Oaks source. The thugs arrived, producing a paper bag three-fourths filled with what appeared to be recently harvested marijuana. They claimed to have stolen it from a back yard; the two homeowners had caught them in the act, but they had severely injured them. There was still a large amount of the crop remaining in the back yard, and the two thugs believed the homeowners were now hospitalized and no one would be home. They did not want to go back themselves because they had already been involved in a fight at the home. Defendant Werth's cousin declined to purchase the contraband. The two thugs left as the cousin got ready for work.

After the departure of the thugs, the defendant's cousin phoned Lutz to tell him that he had not bought the marijuana from them. When he got home from work, he called defendant Werth to see if he wanted to help appropriate the rest of the crop. He told defendant Werth that the home was apparently empty for now and one could just jump over the fence to get the plants. He also told defendant Werth that he did not think a gun would be needed. The cousin suggested bringing a couple of extra people to help transport the crop and keep watch. Defendant Werth said he would try to find someone. Because he did not himself know the address, the cousin called Lutz again for directions. The cousin relayed this to defendant Werth, who mentioned that he had found people to accompany him. The cousin anticipated that he would get a 10 percent share of the haul.

A few months before the crimes, the cousin had sold a gun to defendant Werth of the same caliber as the casings and bullets retrieved at the crime scene. He had also seen defendant Werth with a revolver of some sort.

On the day after the shootings, the codefendants came to the cousin's home and discussed the bungled attack on the residence. Defendant Werth told him that they had gone to the residence with a coparticipant named John. Defendant Werth had the gun he had bought from his cousin; defendant Trujillo had his other gun. They looked in the back yard when they arrived, but did not see any of the crop left. They pushed open the front door and found three people on the sofa. Their coparticipant struck one of them with a flashlight and demanded to know where the crop had gone. Defendant Werth went into a bedroom, where someone pointed a shotgun at him. Defendant Werth fired at him and thought he had

killed him. He ran back to the living room. When one of the occupants advanced on him, he panicked and shot at him and a girl who was screaming. Defendant Trujillo also mentioned firing his gun at a man when he heard the shot in the back of the house and again when the girl was screaming.

Defendant Werth later accused his cousin of trying to set him up. However, at a family function some time afterward, defendant Werth handed his cousin a cloth wrapped around what felt like a five-inch metal bar and asked him to get rid of it. The cousin assumed it was a gun part. He threw it in Lake Natoma.

The cousin moved to Santa Barbara in January 2000. Lutz called him several times discussing the investigation. These were recorded "pretext" calls made on behalf of investigators. The cousin phoned defendant Werth's now-wife (defendant Werth was in Youth Authority custody at the time) to warn her that it would only be a matter of time before authorities followed the trail from Lutz to the others involved in the crimes.

B

John Fjelstad was the coparticipant in the crimes with the defendants. At the time of the crimes, he was on bail for another homicide. In exchange for his testimony, he was allowed to plead to voluntary manslaughter for both homicides, with a prison term of 19 years.

Defendant Trujillo was his good friend, who phoned him on the night of the crimes to say there was marijuana available for the taking. The two defendants came to his house, and defendant Trujillo convinced him to participate. They drove to defendant Werth's apartment, where they phoned the defendant's cousin for the address and made their plans. The defendant's girlfriend was not home.

On the way to the Fair Oaks home, [Fjelstad] noticed that defendant Trujillo had a gun. When they arrived, defendant Trujillo jumped the back fence; on his return, he reported that no plants were left in the back yard, and that he saw someone watching television. At this point, they decided to confront the occupants and force them to reveal the location of the marijuana. By now, [Fjelstad] noticed that defendant Werth had a gun as well.

In [Fjelstad]'s version of the chronology, he had remained in the living room questioning the two occupants while both defendants went to the back of the house. He heard a shot. He ran to the front door. Behind him, he heard a shot. The murder victim was moaning in pain, and it looked as if defendant Werth had shot at him, but [Fjelstad] did not see the shooting. When he got out the door, he heard additional gunfire. The defendants were about

20 seconds behind him. As they fled the scene, defendant Werth mentioned that he had fired on someone in the bedroom who had aimed a shotgun at him, but did not discuss the shootings in the living room. Defendant Trujillo admitted shooting at the murder victim, with bullets passing through him that hit the girl.

Defendant Werth dropped them off near his apartment before parking the car. They arrived at defendant Werth's apartment shortly afterward. Defendant Werth's girlfriend was present. She did not ask any questions, but [Fjelstad] thought she was suspicious that something had happened. Defendant Werth told her to mind her own business and get in the bedroom. The defendants had their guns when the three left to drive defendant Trujillo and [Fjelstad] back to their homes.

Before [Fjelstad] made a statement to the prosecutor, he had the opportunity to read defendant Trujillo's confession. While [Fjelstad] and defendant Werth were awaiting trial, [Fjelstad] sent the latter a letter in which he admitted that he would be accepting a deal from the prosecution, and in which he claimed telling investigators that defendant Werth had not been present at the crimes; however, they were interested only in having consistent statements rather than the truth. [Fjelstad] was concerned about being known as a snitch during his lengthy prison term, and wanted to give defendant Werth a defense.

C

On his arrest, defendant Trujillo initially maintained his innocence. However, he confessed his involvement two days later. His jury heard a transcript of the interview.

Trujillo stated that defendant Werth called him. Since they did not get along that well, defendant Werth asked him to come over so that Trujillo's sister (who was living with Werth and later married him) could talk to him. Defendant Trujillo asserted that his sister did not have any knowledge about what was being planned. Defendant Werth picked him up. After they arrived at defendant Werth's apartment, Werth's cousin called with information. Defendant Werth provided guns for the two of them. They went to the home of [Fjelstad], where defendant Trujillo talked him into assisting them.

Upon their entry into the Fair Oaks home, defendant Trujillo and [Fjelstad] remained in the front room, while defendant Werth went to the back of the house. Defendant Trujillo heard a shot. Defendant Werth came back and started shooting at the murder victim. In fleeing, defendant Trujillo also fired shots at the occupants. When they arrived at defendant Werth's home, the latter was talking to his girlfriend, who had been asleep in the bedroom. After defendant Werth dropped him off at his home,

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 7

defendant Trujillo broke down in tears and told his girlfriend what had happened.

The next day, they went to the cousin's home. Defendant Werth described shooting at the man in the bedroom and the murder victim. He exaggerated the extent to which defendant Trujillo had been shooting at the occupants.

D

Defendant Trujillo's sister[, Guadalupe ("Lupe") Trujillo,] lived with Defendant Werth from December 1997 until his arrest on a juvenile parole violation in February 1999. They married in March 1999.

In contrast with defendant Trujillo's recollection, she testified that before leaving for work on October 5, 1998, she had called him at defendant Werth's insistence and asked him to call defendant Werth. She returned from her restaurant job some time after 2:00 a.m. No one was home.

She went to bed close to 3:00 a.m. Defendant Werth returned home. She noticed that he was agitated when he came into the bedroom. A short time later, there was a knock at the front door. She peered around the door and saw her brother and his good friend, [John Fjelstad]. She asked her brother what he was doing there. Defendant Werth told her to go back to sleep; following her into the bedroom, he told her that he would be taking the other two home. When he returned, he did not answer her questions, but said that she would see something on the news the next day. Watching the morning news, they saw an account of the events of the previous night in Fair Oaks.

Defendant Werth showered and left for his cousin's home. When he came back, he again asked her to call her brother for him. She thought it odd that he was talking with her brother, considering the lack of any bond between them, but placed the call and gave the phone to defendant Werth. He talked with her brother for a few minutes, then left again.

She began to suspect that her boyfriend had a connection with the murder. Eventually, he told her what happened. He admitted firing a gun in the bedroom, and said that her brother had fired a shot in the living room (but did not talk about his own actions in the living room). They did not talk about the incident again. While she was at work in February 1999, defendant Werth was arrested for a juvenile parole violation.

While defendant Werth was in the Youth Authority's custody, he told his wife that there was a gun in their apartment, and she needed to discard it before moving in with defendant Trujillo. She found it in the box he had described. She took it with her

when she moved. At some point, however, it disappeared from the apartment.

Defendant Werth's cousin called her to warn her that Lutz "had pretty much snitched" and provided the prosecution with defendant Werth's name in connection with the crimes. He asked her to pass this information on to her husband, which she did. She also told defendant Trujillo (who by this time had told her about his involvement, although she claimed she could not recall the details of their conversation).

When investigators contacted her in May 2000, they began the interview with a threat to prosecute her as an accessory if she was withholding any information. They mentioned a 25-year sentence. She eventually cooperated. (We will not relate the extensive testimony regarding whether she was afraid of retribution from defendant Werth or anyone else, or her possible biases.) The prosecution ultimately promised her immunity in exchange for her testimony.

E

Defendant Trujillo's girlfriend[, Cynthia Sanchez,] had dated him for three years before giving birth to his daughter in 1997. They had started living together during her pregnancy. She had previously dated [Fjelstad], and continued to alternate between them up to the time of trial.

On the night of the crimes, defendant Trujillo told her that he had been involved in a robbery where someone had been shot. She also claimed that when defendant Werth was driving her to work sometime during the following week, he admitted that he, defendant Trujillo, and [Fjelstad] had committed the home invasion, where he shot at someone in the bedroom. He did not say anything about the shootings in the front room.

In her pretrial interview with investigators, the girlfriend said she primarily recalled the details of defendant Trujillo's account, not defendant Werth's. She remembered both of them mentioning that defendant Werth had fired the first shot in the back room, but acknowledged that she could be admixing details that the codefendants and defendant Werth's wife had told her.

The prosecution had acceded to the girlfriend's insistence on testifying against only defendant Werth. She conceded that she blamed him for getting defendant Trujillo involved in the crimes. She believed Trujillo is not a bad person.

Lodg. Doc. 2, at 2-17.

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 9

At trial, Petitioner was advised by his defense counsel not to testify and Petitioner acquiesced.  (Pet'r Decl. at 5.)

## II.  Procedural History

Although a joint trial was conducted for Petitioner and his co-defendant Trujillo, separate juries were empaneled for each defendant. *See* Lodg. Doc. 5, at 247-248.  Also, the court issued a limiting instruction to Petitioner's jury, stating that:

> During the testimonies of Guadalupe Trujillo ("Lupe") and Cynthia Sanchez, it was elicited during questioning that David Trujillo may have admitted and/or confessed to them his participation in the crimes charged in this case. Further, in the November 20, 2000 tape recorded interview of John Fjelstad, there was reference to a "confession" made by David Trujillo, and there was testimony that David Trujillo gave a statement to Investigator Loehr and Deputy District Attorney Mark Curry.
>
> I instruct you that you may not use any evidence of alleged statements made by David Trujillo as evidence of Ronald Werth's guilt in this case. The reason for this admonishment is that a defendant has a constitutional right to cross-examine every witness against him. In this case, because David Trujillo elected not to testify, Ronald Werth did not have the opportunity to question or cross-examine David Trujillo about the alleged statements. Therefore, again, you may not use evidence of David Trujillo's alleged statements as evidence of Ronald Werth's guilt. You shall not speculate as to the content of any such statements of David Trujillo with respect to whether defendant Ronald Werth is guilty or not guilty.
>
> You may, however, consider the fact that both Guadalupe Trujillo and Cynthia Sanchez provided to investigators information concerning alleged statements of David Trujillo, as evidence bearing upon their credibility as witnesses in this case.

Lodg. Doc. 5, at 282.  Nonetheless, Petitioner and his co-defendant Trujillo were both found guilty of "the capital crime of murder committed in the course of burglary and attempted robbery, and two counts of attempted murder; they also sustained various firearm allegations."  *Id.* at 1.

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 10

The court sentenced Petitioner as follows: For Count 1, murder in the first degree with special circumstances, the court sentenced Petitioner to life without the possibility of parole with an additional 25 years to life for "discharging a firearm in connection with that offense and causing death as charged under Penal Code Section 12022.53(d) . . . ." Lodg. Doc. 1, at 1492.  For Count 2, the attempted murder of Jennifer Salmon, the court sentenced Petitioner to the upper term (under California's Determinative Sentencing Guidelines in force at the time) of nine years "because [Petitioner] was on parole at the time of the commission of the offense" with an additional 25 years to life for "discharging a firearm and causing great bodily injury in connection with Count 2 . . . ." *Id.*  For Count 3, the attempted murder of Shawn Pollard, the court sentenced Petitioner to two years and four months with an additional six years and eight months for discharging a firearm during the commission of that crime. *Id*. at 1493.  The court determined that "[a]ll of the counts will run consecutive to one another as they all involved separate acts of violence." *Id.*

Petitioner appealed from his convictions and sentence to the California Court of Appeals.  Petitioner presented the following issues to the California Court of Appeals:

 1. the evidence was insufficient to sustain the conviction on count two, attempted murder of Jennifer Salmon;

 2. the evidence was insufficient to sustain the conviction on count three, attempted murder of Shawn Pollard;

 3. the evidence was insufficient to support the sentencing enhancement of personal use of a firearm with great bodily injury as to count two, Jennifer Salmon;

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 11

        4. the entire judgment must be reversed because the
trial court declined to instruct that prosecution witness Lupe
Trujillo was an accomplice as a matter of law, or instruct the
jury to determine her accomplice status;

        5. the entire judgment must be reversed because the
introduction of statements of co-defendant David Trujillo denied
Petitioner the right to confrontation;

        6. (Adopted from argument of co-appellant David Trujillo)
there was insufficient evidence to support the special
circumstance of murder in the course of attempted robbery,
because the manifestation of force or fear was not concurrent
with an intent to steal, and the jury instruction incorrectly
stated the law on this point; and

        7. (Second Supplemental Brief) Petitioner was denied the
right to proof beyond a reasonable doubt and jury trial by the
imposition of consecutive sentences without a separate trial on
factors in aggravation.

(Ct. Rec. 2 at 2-3.)  The California Court of Appeals affirmed the

convictions and sentence in all respects on August 19, 2005.  Lodg.

Doc. 2, at 2.

        Petitioner thereafter sought review by the California Supreme

Court.  The petition prepared by counsel presented the following

issues to the California Supreme Court:

        1. whether California's substantial evidence rule may be
used to conclude that federal constitutional error - violation of
the Confrontation Clause - was not prejudicial . . .;

        2. whether Lupe Trujillo's testimony should have been
subject to the jury instructions on accomplice testimony;

        3. whether the evidence was insufficient to support the
conviction and the firearm use enhancement in count two
(attempted murder of Jennifer Salmon);

        4. whether the evidence was insufficient to support the
element of intent to kill, necessary to the conviction in count
three (attempted murder of Shawn Pollard);

        5. whether the evidence was insufficient to support the
special circumstance of attempted robbery to Count One, based
concurrent intent to steal;

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 12

6. whether the jury was incorrectly instructed on a necessary element of the burglary special circumstance, intent to steal concurrent with illegal entry; and

7. whether California authority upholding the imposition of consecutive sentences against constitutional challenge should be reconsidered.

(*Id.* at 3.)  The California Supreme Court denied Petitioner's request for review on November 16, 2005.  Lodg. Doc. 3.

Petitioner filed a petition for Writ of Habeas Corpus with supporting Declarations and Points and Authorities to the California Supreme Court concurrently with this petition.  Lodg. Doc. 4.  In his petition to the California Supreme Court, Petitioner raised the following issues:

1. whether Petitioner was denied effective assistance of counsel by the failure of appointed trial counsel to present evidence which led to the conviction of David Quindt for the same crimes, and the prosecution of Anthony Salcedo for the same crimes . . . ; and

2. whether Petitioner was denied effective assistance of counsel when his appointed trial counsel failed to call Petitioner as a witness in his own behalf.

*Id.*  The California Supreme Court, sitting *en banc*, denied Petitioner's petition for Writ of Habeas Corpus on June 13, 2007. Lodg. Doc. 9.

**ISSUES**

Here, Petitioner presents the following grounds for habeas corpus relief:

1. Petitioner was denied his right to confrontation by the introduction of incriminatory statements of the non-testifying co-defendant, David Trujillo, at Petitioner's trial.

2. The Evidence was insufficient to support the verdict on Count Two, attempted murder of Jennifer Salmon.

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 13

3. Petitioner was denied effective assistance of counsel by the decision not to call Petitioner as a witness in his own defense.

4. Petitioner was denied effective assistance of counsel by the failure to present additional available evidence that Quindt and Salcedo were responsible for these crimes.

5. Petitioner was denied due process and the right to jury trial by the imposition of consecutive terms without jury findings on the relevant sentencing factors.

(Ct. Rec. 2 at 33, 41, 46, 54, 60.)

**DISCUSSION**

**I.   Exhaustion of State Remedies**

As a preliminary issue, Petitioner must have exhausted his state remedies before seeking habeas review:  "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  If state remedies have not yet been exhausted, the petition is barred.  *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).  In order to exhaust state remedies, a petitioner must have raised the claim in state court as a federal claim, not merely as a state law equivalent of that claim.  *See, Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995).  The state's highest court must be alerted to and given the opportunity to correct specific alleged violations of prisoners' federal rights.  *Id.* (citing *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)).  To properly exhaust a federal claim, the petitioner is required to have presented the claim to the state's highest court based on the same federal legal theory and the same factual basis as

is subsequently asserted in federal court.  *Hudson v. Rushen*, 686 F.2d 826, 829-30 (9th Cir. 1982), *cert. denied*, 461 U.S. 916 (1983).

Respondent admits that because Petitioner's petition for review and habeas petition have both been denied by the California Supreme Court, Petitioner's claims have been exhausted at the state level. (Ct. Rec. 29 at 2.)  The Court agrees that Petitioner has properly exhausted all claims presented before this Court at the state level. Claims one, two, and five were submitted to the California Supreme Court and denied on direct review.  Lodg. Doc. 3.  Claims three and four were submitted to the California Supreme Court in Petitioner's Habeas Corpus Petition and were also denied.  Lodg. Doc. 4; Lodg. Doc. 9.  Therefore, Petitioner's application for a Writ of Habeas Corpus satisfies the requirements of 28 U.S.C. 2254(b)(1).

**II.  Merits**

**A.  Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief if a state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d); *see, Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Clearly established federal law" consists of "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Anderson v. Terhune*, 516 F.3d

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 15

781, 798 (9th Cir. 2008) (citing *Lockyer v. Andrade*, 538 U.S. 63, 70-73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)).  A decision is "contrary to" clearly established federal law in two circumstances. First, a state court decision is contrary to clearly established federal law when "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405, 120 S.Ct. at 1519, 146 L.Ed.2d at 425.  Second, a state court decision is "contrary to" clearly established federal law when the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 412-413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430.  A state court unreasonably applies clearly established federal law when it applies the law in a manner that is "objectively unreasonable." *Id.* at 409.  "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) - whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law." *Lockyer*, 538 U.S. at 71.

Furthermore, habeas relief is warranted only if a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *Bains v. Cambra*, 204 F.3d 964, 977-78 (9th Cir.) *cert. denied*, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 16

Petitioner is entitled to habeas relief only if he can show that any constitutional violation "resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 619.

In examining whether state courts reached a decision that was contrary to federal law or whether the state court unreasonably applied such law, the court should look to the last reasoned state court decision. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) *cert.* dismissed, 538 U.S. 919, 123 S.Ct. 1571, 155 L.Ed.2d 308 (2003). Where no reasoning is given in either the state Court of Appeals or the State Supreme Court, Ninth Circuit Courts must determine whether a state court's decision was objectively unreasonable based on an independent review of the record. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (quoting Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Id.*

Here, the last reasoned decision from a California state court is the decision of the California Court of Appeals. Lodg. Doc. 2 (Court of Appeals decision); Lodg. Doc. 3 (Supreme Court of California Petition for Review and Denial); Lodg. Doc. 9 (Supreme Court of California Denial of Writ of Habeas Corpus). However, the California Court of Appeals only considered Petitioner's current claims one, two, and five. Lodg. Doc. 2. Petitioner's current claims three and four were only presented to the California Supreme Court in Petitioner's Habeas Corpus Petition, and the court's decision was not released with

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 17

a reasoned opinion.  Lodg. Doc. 9.  Therefore, this Court should examine the appellate court's decision to determine whether there existed a contrary or unreasonable application of federal law at the state level with regard to claims one, two, and five.  However, because the California Supreme Court did not release a reasoned decision with regard to Petitioner's current claims three and four, this Court must make an independent review of the record in determining whether there existed a contrary or unreasonable application of federal law at the state level with regard to those two claims.

   **B.  Claim One: Violation of Confrontation Clause**

   Petitioner claims that his right to confrontation was violated when the confession of David Trujillo, a non-testifying co-defendant, was introduced through other witnesses' statements at Petitioner's trial and incriminated Petitioner.  (Ct. Rec. 2 at 33.)  To support his claim, Petitioner asserts that although Petitioner and Trujillo were tried with separate juries and although the court issued a limiting instruction to Petitioner's jury not to consider any evidence of Trujillo's confession, other witnesses' testimony in Petitioner's trial "interlocked" with Trujillo's confession, and therefore the limiting instruction was ineffective.  (Ct. Rec. 2 at 35-38.) (citing *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).

///

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 18

The Confrontation Clause of the Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend. VI.  This constitutional guarantee is applicable to the states via the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403-06 (1965).  The Confrontation Clause bars the admission of out-of-court, testimonial statements made by a witness who is unavailable to testify at trial and has not been subject to cross-examination on the same issue by the defendant in the past.  *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365-66, 158 L.Ed.2d 177 (2004)).  Where a confession of a non-testifying co-defendant that incriminates the defendant is admitted into evidence, the Supreme Court has held that the defendant's Confrontation Clause rights are violated even if the jury is instructed to disregard the co-defendant's testimony when determining the guilt of the defendant.  *Bruton*, 391 U.S. at 127, 88 S.Ct. at 1628.

Here, Trujillo's confession is undeniably testimonial in nature as it was given during an interrogation by a law enforcement officers and/or the prosecuting attorney in preparation for trial for the purpose of determining the perpetrator of the burglary/murder at the Salmon house.  *Davis*, 547 U.S. at 826, 126 S.Ct. at 2276; *Crawford*, 541 U.S. at 51-53, 124 S.Ct. 1364-65.  Therefore, because Trujillo refused to testify at Petitioner's trial, Trujillo's confession was inadmissible in front of Petitioner's jury pursuant to the Supreme

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 19

Court's interpretation of the Confrontation Clause. *See Davis*, 547 U.S. at 826-32, 126 S.Ct. at 2276-79; *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374. This fact was acknowledged by the trial judge when he gave Petitioner's jury express instructions to disregard all alleged statements made by Trujillo. Lodg. Doc. 5, at 282.

However, Confrontation Clause violations are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Slovik v. Yates*, No. 06-55867, 2009 WL 311018, at *6 (9th Cir. Feb. 10, 2009), *Whelchel v. Washington*, 232 F.3d 1197, 1205 (9th Cir. 2000); *United States v. Bowman*, 215 F.3d 951, 961 (9th Cir. 2000). Thus, even if this Court assumes that evidence of Trujillo's confession was erroneously admitted in front of Petitioner's jury, the error in admitting the evidence is not a violation of Petitioner's Confrontation Clause rights if the error was harmless to Petitioner. *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

"[I]n reviewing state court decisions for harmless error in the context of a habeas petition, federal courts review to determine if the error had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Slovik*, 2009 WL 311018, at *6 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). The error is deemed not to be harmless if the habeas court is left with "'grave doubt' about whether a constitutional error substantially influenced the verdict . . . ." *Id.* (quoting *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004). This inquiry requires the court to review the record "to determine

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 20

'what effect the error had or reasonably may be taken to have had upon the jury's decision.'" *Id.* (citing *McKinney v. Rees*, 993 F.2d 1378, 1385-86 (9th Cir. 1993). Factors to be considered include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

In the case at hand, even if the trial court erred in allowing testimony by other witnesses that referenced Trujillo's confession, Petitioner's right to confrontation was not violated because, when analyzed through the *Van Arsdall* factors, the references to Trujillo's confession were harmless error. First, Trujillo's confession was not important to the prosecution's case because the prosecution had other key witnesses that testified against Petitioner. John Fjelstad's testimony alone, coupled with even a small amount of circumstantial evidence, such as evidence that Petitioner knew of the opportunity to steal marijuana from the Salmon house, could have been enough to show Petitioner's involvement in the crimes. Petitioner's argument that Fjelstad's reference to Trujillo's confession was prejudicial specifically because the two were "interlocking" in nature might be persuasive in showing that the error was not harmless if Fjelstad was the only witness that implicated Petitioner in the crimes. However, the prosecution also relied on the testimony of Cynthia Sanchez, Lupe Trujillo, and Petitioner's cousin Kelso Vidal, all of whom testified

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 21

that Petitioner confessed to them that he was involved in the robbery and discharge of weapons.  Thus, Trujillo's statement was not important to the prosecution's case because the other witnesses provided sufficient testimony.  In addition, Trujillo's statements were corroborated by the other witnesses' testimony and were also cumulative in that respect.  Furthermore, Petitioner was able to cross-examine the other witnesses.

Finally, any Confrontation Clause error was harmless because the prosecution's case was quite strong even without any reference to Trujillo's confession.  As mentioned above, other witnesses testified that Petitioner confessed his involvement in the crimes.  "As the Supreme Court has declared emphatically, '[a] confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'"  *Moore v. Czerniak*, 534 F.3d 1128, 1130 (9th Cir. 2008) (citing *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).  Testimony of Petitioner's own confession is the single most deciding factor in determining whether any error was harmless.  It is also the factor that the California appellate court relied on in addressing this issue.  In its decision, which was the last reasoned decision on this issue, the appellate court found that any error was harmless beyond a reasonable doubt and makes reference to the testimony of the other witnesses that "damns [Petitioner] in his own words . . . ."  Lodg. Doc. 2, at 18.

The Court finds that any error at Petitioner's trial in allowing evidence of co-defendant Trujillo's confession was harmless as it had

no "substantial and injurious effect or influence in determining the jury's verdict." *Slovik*, 556 F.3d at 755 (quoting *Brecht*, 507 U.S. at 623, 113 S.Ct. at 123) (internal citations omitted).  As pointed out above, the state court based its determination of this issue on proper Supreme Court precedent.  Accordingly, Petitioner is not entitled to habeas relief on claim one.

### C.  Claim Two: Insufficient Evidence

Petitioner also claims that the evidence presented at trial was insufficient to support his conviction with regard to count two, the attempted murder of Jennifer Salmon.  (Ct. Rec. 2 at 41.)  Petitioner asserts that (1) there is no evidence showing that Petitioner directly caused injuries to Jennifer Salmon and (2) there was no evidence of intent to kill Jennifer Salmon.  (Ct. Rec. 2 at 41-43.)

In determining whether evidence was sufficient to support a conviction, a federal court must uphold the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362, 92 S.Ct. 1620, 1624-25, 32 L.Ed.2d 152 (1972)); *Brown v. Farwell*, 525 F.3d 787, 794 (9th Cir. 2008).  If conflicting inferences are supported by the record, a court must give deference to the jury's decision on the matter by presuming "that the trier of fact resolved any such conflicts in favor of the prosecution . . . ." *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793.

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 23

As for the substantive elements required for the offense, federal courts must look to state law. *Id.* at 324 n. 16, 99 S.Ct. at 2792 n. 16. In California, "attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." *People v. Smith*, 37 Cal.4th 733, 739, 124 P.3d 730, 739 (2005) (quoting *People v. Lee*, 31 Cal.4th 613, 623, 74 P.3d 176 (2003)) (internal quotations omitted). If intent cannot be proven by direct evidence or evidence of the circumstances surrounding the attempt, "[t]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'" *Id.* at 741, 124 P.3d at 736 (quoting *People v. Lashley*, 1 Cal. App. 4th 938, 945, 2 Cal. Rptr. 2d 629 (1991)). Unlike murder, the intent requirement for attempted murder cannot be transferred from one person to another and therefore specific intent to kill the attempted murder victim is required. *Id.*

Here, Petitioner's jury was properly instructed with regard to the requirements for attempted murder. Lodg. Doc. 5 at 296. In examining the record, a reasonable jury could have found that Petitioner had the requisite intent to be convicted of the attempted murder of Jennifer Salmon. First, Petitioner's cousin, Kelso Vidal, stated in his testimony that Petitioner told him they wanted to "shut her up" when referring to Jennifer Salmon and the shooting in the livingroom of the Salmon house. Lodg. Doc. 7 at 608-609. Also, evidence was presented at trial that a high-powered gun similar to a

9mm pistol was used in the shooting and that Petitioner was in possession of such a pistol at the time of the attempted murder.   Even if there was no direct evidence of Petitioner's intent to kill Jennifer Salmon, a reasonable jury could have found that Petitioner had the requisite intent because the evidence showing he discharged a weapon in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill.   Furthermore, a reasonable jury could have relied on this same evidence in determining whether Petitioner directly caused the injuries to Jennifer Salmon.

As mentioned above, the California appellate court issued the last reasoned decision with regard to claim two.   Lodg. Doc. 2 at 19-21.   In its decision, the appellate court gave deference to the judgement of the jury and stated that "we will not override a plausible implied inference supporting the judgment merely because an equally plausible inference to the contrary is possible."   *Id.* at 20. The state court's decision was neither contrary to or an unreasonable application of *Jackson v. Virginia*.   Accordingly, Petitioner is not entitled to habeas relief on claim two.

**D.  Claims Three and Four: Ineffective Assistance of Counsel**

Petitioner's third and fourth claims allege ineffective assistance of counsel.  (Ct. Rec. 2 at 46, 54.)

In reviewing a claim of ineffective assistance of counsel, the Court applies a two-part test: "First, the defendant must show that counsel's performance was deficient.   Second, the defendant must show that the deficient performance prejudiced the defense."   *United States*

*v. Recio*, 371 F.3d 1093, 1109 (9th Cir. 2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)).  Under the first element, the Court must examine "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065.  This requires the Court to analyze counsel's performance with some deference, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.  Counsel's performance is not ineffective unless it fails to meet an objective standard of reasonableness under prevailing professional norms.  *Id.* at 688, 104 S.Ct. at 2065.

Under the second element, it must be shown "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Recio*, 371 F.3d at 1109 (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.  In other words, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694**.**  This prejudice evaluation requires an examination of the totality of the evidence presented to the jury in conjunction with a recognition that where there exists "overwhelming record support," a different outcome is less likely. *Id.* at 695-96.  A court reviewing an ineffective assistance of counsel claim "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 26

of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

As mentioned above, the court must make an independent review of the record with regard to claims three and four because the California Supreme Court did not release a reasoned decision with regard to Petitioner's ineffective assistance of counsel claims.  The analysis below therefore reflects an independent review of the record, which now includes all materials submitted as of July 18, 2008, including the habeas petition, answer, traverse, and other records lodged with the Court.

**1.  Claim Three**

Petitioner's third claim asserts he was denied the effective assistance of counsel based on his trial attorney's decision not to call Petitioner as a witness in his own defense.  (Ct. Rec. 2 at 46.) In support of his claim, Petitioner submits a signed declaration from himself and a signed declaration from Billy Wolfington.  In Petitioner's declaration, he claims that he was "ready and willing to testify" at the time of the trial and that if he had testified, he would have testified that he was at a recording studio and involved in an altercation at said studio on the night of October 5, 1998, and early hours of the morning of October 6, 1998, during the time of the shootings at the Salmon house.  (Pet'r Decl. at 5.)  In Billy Wolfington's declaration, Wolfington expresses that he had a willingness to testify at the time of Petitioner's trial and that he

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 27

was at the recording studio on the evening October 5, 1998, and was involved in an altercation at the studio around 2:00 a.m. on October 6, 1998, that was broken up by a person named "Kruger" (Petitioner alleges in his declaration that "Kruger" was his nickname at the time). (Wolfington Decl. at 1.)

Even though Petitioner claims that he would have testified, he also admits that when his trial counsel advised him not to testify, he acquiesced. (Pet'r Decl. at 5.) Thus, by remaining silent in the face of his attorney's decision not to call him, Petitioner effectively waived his right to testify. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993); *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990), cert. denied, 498 U.S. 1000, 111 S.Ct. 560, 112 L.Ed.2d 567 (1990)). Nonetheless, Petitioner asserts that his trial counsel's advice not to testify, in and of itself, amounted to a violation of the first prong of the *Strickland* test. (Ct. Rec. 31 at 7.)

As Respondent points out, however, "[a] disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006) (citing *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (per curiam)). Also, as mentioned above, the first prong of the *Strickland* test requires that the court examine counsel's performance with deference because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Thus, in

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 28

federal habeas cases where ineffective assistance of counsel is
asserted, *Strickland* requires deference to the trial attorney's
decisions and the AEDPA requires deference to the state court's
decision. *Brown v. Ornoski*, 503 F.3d 1006, 1011 (9th Cir. 2007).

With this "double deference" requirement in mind, it is the
opinion of this Court that Petitioner has not met his burden of
proving that his trial attorney acted in an unreasonable manner when
he advised Petitioner not to testify as a witness on his own behalf.
Although Petitioner asserts that "no effective defense was possible
without Petitioner's testimony" (Ct. Rec. 31 at 7), he fails to
acknowledge that his trial attorney may have advised him not to
testify only after meticulously weighing the potential benefits and
detriments. As Respondent points out, there are many possible reasons
why a reasonable attorney would not want to subject Petitioner to
questioning at trial. (Ct. Rec. 29 at 38-39.) Given all the
circumstances, it is not clear that Petitioner's trial counsel acted
unreasonably. Furthermore, under AEDPA requirements, Petitioner has
not shown that the state court's decision to deny his habeas petition
with regard to claim three was either contrary to or an unreasonable
application of *Strickland*. Therefore, Petitioner is not entitled to
habeas relief on claim three.[1]

///

---

[1]The second prong of *Strickland* (prejudice) need not be
addressed here because Petitioner's claim fails on the first
prong. However, even if Petitioner successfully proved that his
trial counsel was ineffective, it is unlikely that Petitioner has
shown to a sufficient degree that he would be prejudiced by any
advice or decision of his trial counsel.

**2.  Claim Four**

Petitioner's fourth claim asserts that he was denied effective assistance of counsel when his trial attorney failed "to present additional available evidence that Quindt and Salcedo were responsible for these crimes." (Ct. Rec. 2 at 54.)  There are two specific points that Petitioner highlights in order to support his claim that trial counsel failed to provide effective assistance with regard to claim four: (1) trial counsel did not adequately present John Anderson's prior testimony from the Quindt trial regarding Salcedo's alleged confession to Anderson; and (2) trial counsel failed to bring up evidence that Salcedo was involved in a prior home invasion to steal marijuana where the home's occupants were held at gunpoint.  (Ct. Rec. 2 at 55-56.)  Although there may be sufficient evidence to dispose of these two grounds for claim four by applying the first prong of the *Strickland* test, Petitioner was not prejudiced even if his trial counsel's assistance was ineffective; accordingly, the Court finds that an examination of possible prejudice is all that is required here.

First, a reasonable jury could have decided that Petitioner was guilty beyond a reasonable doubt even if John Anderson's testimony in Petitioner's trial were identical to his testimony in the Quindt trial.  In Mr. Anderson's testimony from the Quindt trial, he stated that Salcedo did not admit that he was at the Salmon house when the incident occurred.  (Ct. Rec. 2, Ex. 4 at 1036.)  In fact, the only potentially incriminating portion of Mr. Anderson's testimony at the Quindt trial was his recollection that Salcedo made a comment to him

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 30

1   regarding the "rush" one feels when participating in a home invasion
2   and holding a gun, and that Riley Haeling "tried to be a hero." (*Id.*)
3   Thus, Petitioner's characterization of the discussion between Anderson
4   and Salcedo as a "confession" is inaccurate.

5       If this evidence were fully presented at Petitioner's trial, a
6   reasonable jury could have concluded that Salcedo's comments were
7   merely speculation and/or a reference to an unrelated past incident
8   and do not prove that Salcedo was involved in the robbery at the
9   Salmon house or the murder of Riley Haeling.  This reasonable
10  conclusion, coupled with the fact that Petitioner's conviction has
11  overwhelming record support, leads the Court to conclude that the
12  state court properly applied *Strickland* and determined that the
13  failure of trial counsel to present Anderson's full discussion with
14  Salcedo does not undermine the confidence in the outcome of
15  Petitioner's trial.

16      Second, the overwhelming evidence that Petitioner was involved in
17  the crimes at issue here could have led a reasonable jury to find that
18  Petitioner was guilty beyond a reasonable doubt even if evidence of
19  Salcedo's alleged involvement in a prior robbery were admitted.
20  According to the testimony of Jimmy Mccollem, Salcedo was not even
21  present at the alleged prior robbery.  (Ct. Rec. 2, Ex. 5 at 39-40.)
22  Instead, Mr. Mccollem testified at the Quindt trial that Solcedo
23  merely came up with the general plan for the prior robbery.  (*Id.* at
24  35.)  Also, Petitioner exaggerates the distinctiveness of the common
25  features found in both Salcedo's prior alleged robbery and the robbery
26  in this case.  Specifically, using a gun to rob a home that is known

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 31

to contain marijuana is not a distinctive feature that shows that the same person committed both robberies.  Similarly, using a gun to compel occupants to sit on a couch during a home invasion is not a distinctive feature.  Thus, even if evidence of Salcedo's alleged involvement in a similar past robbery were presented and allowed in Petitioner's trial, the probative value of the evidence indicating that Salcedo was involved in a prior marijuana robbery is such that a reasonable jury could have dismissed it as coincidence.  Furthermore, the conclusion that Petitioner was involved in the crimes at issue in this case is supported by overwhelming record support.  Therefore, the state court was objectively reasonable when it concluded, by applying the *Strickland* test, that Petitioner's trial attorney's failure to present evidence of Salcedo's alleged prior robbery does not undermine the confidence in Petitioner's conviction.

Even if Petitioner satisfied the first prong of the *Strickland* test, he was not prejudiced by his trial attorney's failure to fully explain John Anderson's prior testimony or to provide evidence of Salcedo's alleged involvement in a similar prior robbery.  Based on an examination of the totality of the evidence, there is not a reasonable probability that, but for trial counsel's failure to do those things, Petitioner would not have been convicted.  Therefore, the state court correctly applied the *Strickland* test and determined that Petitioner's request for habeas corpus relief be denied.  Based on the foregoing, the Court finds that Petitioner is not entitled to habeas relief on claim three or claim four.

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 32

1    **E.   Claim Five: Imposition of Consecutive Terms by Judge**

2         Petitioner claims that he was denied due process as well as his

3    Sixth Amendment right to jury trial when the judge, instead of the

4    jury, found it necessary to impose consecutive sentences.  To support

5    his assertion, Petitioner cites *Blakely v. Washington*, 542 U.S. 296,

6    124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *Cunningham v. California,*

7    549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007).  (Ct. Rec. 2 at

8    60.)

9         Although *Cunningham* abrogated *People v. Black*, 35 Cal.4th 1238

10   (2005), the case that the California Appellate Court cited to when

11   disposing of Petitioner's claim, and held California's determinative

12   sentencing law to be unconstitutional, *Cunningham* only addressed the

13   issue of when judges are permitted to find facts necessary to impose a

14   sentence above the statutory maximum and did not address the

15   constitutionality of a judge's ability to impose consecutive

16   sentences.  *Cunningham*, 549 U.S. at 275, 127 S.Ct. at 861.  Therefore,

17   *Cunningham* does not apply to the specific issue raised here by

18   Petitioner.[2]

19        However, in its recent decision of *Oregon v. Ice*, ___ U.S. ___,

20   129 S.Ct. 711, 172 L.Ed.2d 517 (2009), the United States Supreme Court

21   addressed the issue of whether a judge, instead of a jury, may

22   determine facts that are declared necessary to impose consecutive

23   _____

24        [2]Petitioner did raise the issue at the California Court of
     Appeals of whether his Sixth Amendment rights were violated when
25   the judge imposed the upper sentence with regard to Count 2,
     which would implicate the Supreme Court's ruling in *Cunningham*.
26   *See* Lodg. Doc. 2 at 32-33.  However, Petitioner fails to raise
     such a claim here and therefore it is not addressed.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 33

sentences in light of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely*, 542 U.S. 296.  The Court held that the practice of allowing judges to determine whether sentences for discrete offenses should be imposed consecutively or concurrently is not in violation of the Sixth Amendment as interpreted in *Apprendi* and *Blakely*.  *Ice*, 129 S.Ct. at 714-715.  In delivering the majority's holding, Justice Ginsburg explained that "[t]he decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures."  *Id.* at 717 (citing *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2356) (internal citation omitted).

Before *Ice* may be applied to the case at hand, the issue of retroactivity must be addressed by applying the standard expressed in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Butler v. Curry*, 528 F.3d 624, 633 (9th Cir. 2008) (citing *Beard v Banks*, 542 U.S. 406, 412, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004)) (stating that when issues of retroactivity arise "'federal habeas courts *must* apply *Teague* before considering the merits' of a claim")[3]. The first step in applying *Teague* is to determine whether the new decision expressed a "new rule" or an "old rule" with regard to prior

---

[3]"*Teague* was a plurality opinion, but the *Teague* rule was adopted by a majority of the Court shortly thereafter in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)." *Butler*, 528 F.3d at 633 n. 7 (citing *Danforth v. Minnesota*, ___ U.S. ___, 128 S.Ct. 1029, 1033 n. 1, 169 L.Ed.2d 859 (2008)).

precedent in force at the time Petitioner's conviction became final (i.e. when Petitioner exhausted direct review options in state court). *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070; *Butler*, 528 F.3d at 633-34.  While "new rules" only apply retroactively on direct review, "old rules" are retroactively applicable on both collateral as well as direct review.  *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007); *Butler*, 528 F.3d at 633.  "Old rules" are those where the result was dictated by then-existing precedent at the time the petitioner's conviction became final.  *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070; *Butler*, 528 F.3d at 633-34.

The rule expressed in *Ice* can be considered an "old rule" under the *Teague* analysis because the rule is dictated by precedent as set forth in the *Apprendi* line of cases.  *Ice*, 129 S.Ct. at 716-17.  As Justice Ginsburg's majority opinion points out, an analysis under *Apprendi* and its progeny requires a determination of whether the particular situation at issue is "within 'the domain of the jury . . . by those who framed the Bill of Rights.'"  *Id*. at 717 (quoting *Harris v. United States*, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002)).  Thus, an analysis of whether an issue falls under the *Apprendi* rule must be done through an examination of the historical record.  *See id*.  This was already the required analysis on November 16, 2005, when the California Supreme Court denied review and Petitioner's conviction became "final."  *See id*.  Because the rule expressed in *Ice* was dictated by precedent that was in force when

///

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 35

Petitioner's conviction became final, it is an "old rule" that may be retroactively applied to the case at hand.  *See Teague*, 489 U.S. at 301; *Butler*, 528 F.3d at 633-34.

The majority opinion in *Ice* performed a thorough examination of the considerations necessary to analyze the issue at hand through the scope of existing Supreme Court precedent including *Apprendi*, its progeny, and necessary historical practices.  *Id.* at 717-719.  The Court's final determination in *Ice*, based on the analysis of its own precedent (most of which was in force in 2005), was that judges may themselves decide the facts necessary to impose consecutive sentences. *Ice*, 129 S.Ct. at 714-15.

Despite the fact that, in deciding this issue, the California Court of Appeals relied on *People v. Black*, which was later abrogated by the Supreme Court in *Cunningham v. California*, the Court finds, for the foregoing reasons, that the decision of the California Court of Appeals was not contrary to federal law as interpreted by the Supreme Court, nor was it an unreasonable application of the same. Accordingly, Petitioner is not entitled to habeas relief on claim five.

**CONCLUSION**

The Court being fully advised, **IT IS HEREBY ORDERED** Petitioner's Petition for Writ of Habeas Corpus (**Ct. Rec. 2**) is **DENIED**.  Judgment shall be entered in favor of Respondent and against Petitioner.

///

///

///

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS - 36

1       **IT IS SO ORDERED.**   The District Court Executive is hereby

2   directed to enter this order, **enter judgment accordingly**, furnish

3   copies to counsel and **Petitioner** and **CLOSE THE FILE**.

4       **DATED** this   22nd   day of September, 2009.

5
                              S/Fred Van Sickle
6                             Fred Van Sickle
                      Senior United States District Judge
7                     _____

8

9               _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS – 37